ANTHONY G. PIZZARELLI and HELEN PIZZARELLI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pizzarelli v. Commissioner
Docket Nos. 8407-75, 12056-78.
United States Tax Court
T.C. Memo 1980-118; 1980 Tax Ct. Memo LEXIS 472; 40 T.C.M. (CCH) 156; T.C.M. (RIA) 80118; April 14, 1980, Filed *472 In 1970 petitioner Anthony G. Pizzarelli, a 50 percent shareholder in Ulster Tool and Die Corp., diverted corporate checks for his personal benefit. During the years 1969, 1970 and 1971 Pizzarelli received funds from Ulster- Hurley Properties, another corporation in which he was a 50 percent shareholder. Held, the diverted proceeds were ordinary income, and not loans, to petitioners in 1970. Held further, the funds received from Ulster-Hurley Properties were constructive dividends in the years of receipt and not loans. Held further, sec. 6653(b) addition to tax for fraudulent underpayment imposed for taxable year 1970. Raymond M. Pezzo, for the petitioners. Scott D. Anderson, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The statutory notice of deficiency with respect to calendar years 1969 and 1971 was dated June 16, 1975. The statutory notice concerning calendar year 1970 was dated August 8, 1978. In these statutory notices of deficiency, respondent asserted the following: Sec. 6653(b) Year
Deficiency
Addition to Tax
1969
$12,208.45
$0
1970
35,397.84
17,698.92
1971
350.60
0
After concessions the remaining issues are: (1) whether the Ulster-Hurley Properties, Inc. checks and property in the amount of $21,500 received by petitioner in his taxable years 1969, 1970 and 1971 constitute ordinary income; and (2) whether the $55,466.52, which petitioner diverted from corporate proceeds of Ulster Tool and Die Corporation in his 1970 taxable year and represented by two checks from Ferroxcube Corporation, constitute ordinary income or nontaxable loans. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, *474 together with the exhibits attached thereto, are incorporated herein by this reference.
Anthony G. Pizzarelli (petitioner) and Helen Pizzarelli [1] resided in West Hurley, New York at the time the petition in docket No. 8407-75 was filed, and in Stuart, Florida at the time the petition in docket No. 12056-78 was filed. Mr. and Mrs. Pizzarelli timely filed their Federal income tax returns for 1969, 1970 and 1971 with the Internal Revenue Service Center, Andover, Massachusetts. During the period January 1, 1968 to May 15, 1976, petitioner owned a 50 percent interest in the Ulster Tool and Die Corporation (Ulster Tool and Die), a manufacturing company incorporated on September 17, 1946 in the State of New York. During that same period Frank J. Falatyn (Falatyn) owned the remaining 50 percent interest in Ulster Tool and Die. On May 15, 1976 Falatyn purchased all of petitioner's interest in Ulster Tool and Die. Petitioner was president of Ulster Tool and Die during its fiscal years ended August 31, 1969, 1970, 1971 and 1972. *475 Ulster Tool and Die's business consisted of making tools, dies, jigs, fixtures, gauges, production and development work and automatic equipment to meet customer specifications. Petitioner managed the corporation's office, sold the services of the company, estimated the cost of performing contracts and handled customer relations. Falatyn ordered materials, managed the company shop, solved engineering and fabrication problems and generally was concerned with the production of the corporation's products. In the usual conduct of Ulster Tool and Die's business, when checks in payment for work done by the company were received, the corporation's secretary and brookkeeper would place the checks in an unlocked file cabinet drawer. The corporation's receipt checks would be kept in the file drawer for approximately 2 or 3 months before they were deposited in the corporation's checking account. Normally petitioner, and occasionally Falatyn, would deposit the receipt checks in the corporation's checking account when it was determined that the corporation needed funds to pay expenses. On July 25, 1969 Falatyn began making a record of when checks payable to the corporation were received *476 and when those checks were deposited in the corporation's checking account. Falatyn made this record because he did not trust petitioner to deposit all of Ulster Tool and Die's receipt checks. On October 15, 1969 petitioner received a check from the Ferroxcube Corporation (Ferroxcube) in the amount of $28,090.09. This check was payable to Ulster Tool and Die and was a receipt of that corporation. On January 2, 1970 petitioner negotiated the check and used the proceeds for his personal needs.On November 7, 1969, petitioner received a second check from Ferroxcube in the amount of $27,376.43. This check was also payable to Ulster Tool and Die and was a receipt of that corporation. On February 18, 1970 petitioner deposited the check into his personal checking account and used the proceeds for his personal needs. Petitioner did not inform Falatyn that he had taken the two Ferroxcube checks and used the proceeds for his own personal benefit until February, 1970 when Falatyn inquired of him why the corporate receipt checks had not been deposited. Petitioner informed Falatyn that he had borrowed the proceeds and that the checks were not lost. At that time Falatyn expressed displeasure *477 with petitioner. Sometime after petitioner took the proceeds of the Ferroxcube checks minutes of a meeting of the board of directors of Ulster Tool and Die were prepared which showed that the board authorized petitioner to borrow $60,000 from the corporation. The minutes were not prepared or signed by Falatyn on October 9, 1969, the date shown thereon, but were prepared sometime after Falatyn's February 1970 confrontation with petitioner with respect to the missing corporate receipt checks. Petitioner knew that Paul Schatzel (Schatzel) determined the gross receipts of Ulster Tool and Die from an analysis of deposits to the corporation's checking account. However, petitioner never informed Schatzel that the corporation had received the two Ferroxcube checks. Nor was he informed that petitioner and Falatyn had agreed that the proceeds of the checks would be considered as a loan from Ulster Tool and Die to petitioner. Schatzel did not have access to the corporation's minutes sheets when he prepared its tax returns. The failure of Ulster Tool and Die to report the income received from the two Ferroxcube checks on the corporate income tax return was first brought to Schatzel's *478 attention by an Internal Revenue agent during an audit of the corporation that commenced in the fall of 1972. Sometime after november 1973 Falatyn informed Schatzel that the $55,466.52, which petitioner received from the proceeds of the Ferroxcube checks, should be treated as a loan to petitioner on the books and records and the income tax returns of Ulster Tool and Die. Petitioner carefully reviewed Ulster Tool and Die's corporate tax returns for the fiscal year ended August 31, 1970, but did not call Schatzel's attention to the omission of the $55,466.52 received from Ferroxcube as income on the corporation's tax returns for that fiscal year. Nor did he, or Falatyn, call Schatzel's attention to the fact that the alleged loan to petitioner in the amount of $55,466.52 was not reflected as a loan to a shareholder on Ulster Tool and Die's tax returns for fiscal years ended August 31, 1970, 1971, 1972 and 1973. A loan from Ulster Tool and Die to petitioner in the amount of the Ferroxcube checks was first reflected in the books and records and on the corporate income tax returns after the close of the corporation's August 31, 1974 fiscal year. On October 6, 1971 petitioner borrowed *479 $25,000 from Ulster Tool and Die. This loan was distributed to petitioner in the form of a check written on the corporate bank account. Petitioner repaid the loan on July 18, 1972. The loan and repayment of the $25,000 was reflected in the books and records and on the corporate income tax returns of Ulster Tool and Die in the years in which the loan and repayment occurred. Petitioner and Falatyn borrowed money from Ulster Tool and Die from time-to-time; in each instance they received the loan by means of a check written on the account of Ulster Tool and Die. By personal checks petitioner, between December 24, 1974 and October 30, 1975, repaid Ulster Tool and Die $50,000 of the diverted Ferroxcube payments. The balance of the Ferroxcube payments "loan" was paid when petitioner sold his share of Ulster Tool and Die to Falatyn. Most, if not all, of the "loan" payments were made after petitioner was informed by the Internal Revenue Service that he was under criminal investigation for his failure to report the proceeds of the Ferroxcube checks as income. During the period from January 1, 1969 until September 13, 1979 petitioner owned a 50 percent interest in Ulster-Hurley Properties, *480 Inc. (Ulster-Hurley Properties), a real estate investment company incorporated on December 31, 1968. Prior to the incorporation of Ulster-Hurley Properties, the company operated as a subchapter R partnership with petitioner and Falatyn each having a 50 percent interest. Falatyn is, and was, a 50 percent owner of Ulster-Hurley Properties and its predecessor partnership. Ulster-Hurley Properties is on a fiscal year ending April 30. Its corporate income tax returns reported retained earnings in excess of $50,000 and no dividend distribution during fiscal years ended April 30, 1969, 1970 and 1971. Petitioner and Falatyn each received corporate checks in the total amounts of $9,500, $2,000 and $1,000 from Ulster-Hurley Properties in 1969, 1970 and 1971, respectively. The distributions received in calendar years 1969 and 1971 were charged on the books and records of Ulster-Hurley Properties as advances and shown on the corporate tax returns for fiscal years ended April 30, 1969, 1970 and 1972 as loans to shareholders. The 1970 calendar year distributions were charged on the books and records of the corporation as advances and shown as compensation to officers on the corporation's *481 tax return for fiscal year ended April 30, 1971. The 1970 distributions were reflected as loans to shareholders on Ulster-Hurley Properties' amended income tax return for fiscal year ended April 30, 1971, which was filed by the corporation on September 5, 1972. Petitioner did not report as gross income the distributions he received from Ulster-Hurley Properties in 1969, 1970 or 1971 on his income tax returns for those years. At the time Ulster-Hurley Properties was incorporated petitioner and Falatyn transferred the Lake Katrine Rod and Gun Club (Lake Katrine property) to the corporation. They had purchased the land in 1955 for $18,000. On May 8, 1969 the Lake Katrine property was transferred from Ulster-Hurley Properties to petitioner and Falatyn as tenants in common. On that same date petitioner and Falatyn executed a mortgage in favor of Ulster-Hurley Properties in the amount of $18,000. The mortgage agreement called for interest at 6 percent per annum on the unpaid principal balance and principal payments of $1,800 a year. Neither the interest or principal payments called for in the mortgage were ever paid. Petitioner did not include receipt of an interest in the Lake *482 Katrine property as income on his 1969 income tax return. On January 30, 1970 petitioner and Falatyn entered into a contract for the sale of the Lake Katrine property to Commonwealth Development Corp. (Commonwealth) for $70,000. Negotiations concerning this purchase were conducted by petitioner and Falatyn for a period of between 6 months and 1 year prior to the execution of the contract of sale.The sale of the Lake Katrine property to Commonwealth was never consummated. On July 22, 1975 petitioner and Falatyn purportedly sold the Lake Katrine property to Ulster-Hurley Properties for $80,000. Part of this $80,000 was used to cancel the $18,000 mortgage and $33,000 owed to the corporation by petitioner and Falatyn including the $25,000 advanced to petitioner and Falatyn in 1969, 1970 and 1971. The remaining $29,000 of the purchase price was paid one-half to petitioner and one-half to Falatyn. Ulster-Hurley Properties obtained the $29,000 transferred to petitioner and Falatyn by securing a loan from the pension fund of Ulster Tool and Die.
OPINION We direct ourselves first to transactions involving Ulster-Hurley Properties, Inc. Petitioner and Falatyn each received checks *483 issued by Ulster-Hurley Properties in the amounts of $9,500, $2,000 and $1,000 in 1969, 1970 and 1971, respectively. The 1969 and 1971 checks were charged on the books and records of the corporation as advances and reported on its corporate returns for fiscal years ended April 30, 1969, 1970 and 1972 as loans to officers. The 1970 checks were recorded as advances but were reported as compensation on the corporation's original fiscal year ended April 30, 1971 return. On the corporation's amended return for fiscal year ended April 30, 1971 filed on September 5, 1972, the advances were reflected as loans to petitioner and Falatyn rather than compensation. Respondent argues that the advances were not loans but instead constructive corporate dividends taxable to petitioner as ordinary income. Distributions made by a corporation for the personal benefit of a shareholder may result in constructive dividends to that shareholder. Challenge Manufacturing Co. v. Commissioner,37 T.C. 650, 663 (1962). The subjective intent of the parties is the controlling factor. However, the *484 following objective factors are used to determine that intent: (1) Whether the corporation is closely held and controlled; (2) the corporation's history with respect to dividends; (3) the availability of earnings and profits from which the corporation could pay dividends; (4) whether the transfer was documented by notes or an assignment of security; (5) the payment or accrual of interest; (6) whether transfers were made in proportion to stockholdings; (7) how the transferred funds are used; (8) whether the shareholder had a plan and means for repayment; (9) how the transfer is treated on the books and records of the corporation and shareholder; and (10) the history of repayment. The first eight factors militate against petitioner's contention that the advances were loans. Ulster-Hurley Properties was a corporation wholly owned and controlled by petitioner and Falatyn. The corporation apparently had ample earnings and profits yet it never declared a dividend. Further, petitioner admits that no promissory note or corporate resolution was executed to document the loans and that they were interest free. Finally, Falatyn testified that he neither planned, nor had the ability, to *485 make repayment. These facts, along with Falatyn's testimony that he and petitioner had to be reminded by Schatzel that according to Ulster-Hurley Properties' books and records they owed the corporation money, establish in our minds that the advances were not bona fide loans. The history of repayment, discussed infra, can be seen at best as supporting neither party. The only factor supporting petitioner is the treatment of the distribution on the books and tax returns of the corporation.This factor is insufficient to mitigate a finding that no loan was intended, particularly where petitioner did not impress us as a credible witness on the stand. When Ulster-Hurley Properties was incorporated on December 31, 1968, petitioner and Falatyn transferred the Lake Katrine property to the corporation. Petitioner and Falatyn had purchased the land in 1955 for $18,000. On May 8, 1969 petitioner and Falatyn bought the Lake Katrine property back from Ulster-Hurley Properties. The minutes of a meeting of the corporation's board of directors held on July 22, 1975 state that the purchase price of the 1969 sale had been $20,000 which was paid by a mortgage for $18,000 and a promissory *486 note for $2,000. The mortgage called for 6 percent interest on the unpaid balance each year and principal payments of $1,800 a year. Petitioner was unable to produce a copy of the alleged note. Also during 1969 petitioner and Falatyn were engaged in negotiations to sell the property. These negotiations culminated in an agreement of sale that was executed on January 30, 1970. However the sale subsequently fell through. Petitioner and Falatyn held the property until 1975 when they sold it back to Ulster-Hurley Properties for $80,000. The proceeds of this sale were used to repay the previously discussed advances and the outstanding mortgage from 1969. The sale also provided each seller with $14,500 in cash. The fact that Ulster-Hurley Properties did not have $29,000 to pay petitioner and Falatyn was solved by having the corporation borrow $30,000 from the Ulster Tool and Die pension fund. Respondent argues that the 1969 sale from Ulster-Hurley Properties to petitioner and Falatyn was a dividend distribution and not a bona fide sale. While the form of the transaction supports in part petitioner's position, the substance of the transaction supports respondent. The alleged *487 promissory note was not produced at trial nor was it reported on Ulster-Hurley Properties' corporate tax return for fiscal years ended April 30, 1970, April 30, 1971, or on the amended return for April 30, 1971 as an asset of the corporation. Petitioner and Falatyn never made the interest or principal payments called for under the mortgage. Further, petitioner testified that the negotiations with Commonwealth for the sale of the Lake Katrine property may have begun more than 6 months to a year before the sale agreement was signed. Apparently petitioner and Falatyn's purchase of the property from Ulster-Hurley Properties occurred during the time the negotiations with Commonwealth were taking place. The obvious benefit from the purchase was to avoid the corporate tax on the gain from the sale, while allowing petitioner and Falatyn to report their gain as capital gain. Further evidencing this ntention is the difference in purchase price paid by petitioner and Falatyn ($20,000) and the agreed upon sales price to Commonwealth ($70,000). Petitioner asks us to believe that the fair market value of the property increased only $2,000 from 1955 to 1969, while it increased $50,000 from May 8, 1969 to *488 January 30, 1970. Neither petitioner nor Falatyn gave a reason for the sudden increase in value. Based upon our above discussion we find that petitioner's receipts of $9,500, $2,000 and $1,000 in cash from Ulster-hurley Properties are taxable as dividend income in the years received. Further, we find that the purchase of the Lake Katrine property was not a bona fide sale but instead a dividend distribution taxable to petitioner in 1969. Accordingly, we sustain respondent's determination that petitioner's receipt of the property resulted in a constructive dividend in the amount of $9,000.
In 1970 petitioner diverted $55,466.52 from the proceeds of two checks issued by the Ferroxcube Corporation to the Ulster Tool and Die Corporation for his personal use. The issues presented are: (1) whether the diverted proceeds were income to petitioner in 1970, and (2) if so, whether any of the underpayment of tax in 1970 was due to fraud. With respect to the fraud issue the burden of proof is on respondent. Rule 142, Tax Court Rules of Practice and Procedure. Absent a finding of fraud the statute of limitations bars assessment of unreported 1970 income. Petitioner concedes receipt *489 of the two corporate checks and the use of the proceeds for personal purposes, but contends that the proceeds were received as a loan. Respondent argues, to the contrary, that the proceeds represent taxable income, either embezzlement or constructive dividend. Where a substantial shareholder is involved, the line between the two can be blurred. There was a time when the distinction between the two was crucial with different tax consequences flowing from the characterization. In Commissioner v. Wilcox,327 U.S. 404 (1946), the Supreme Court held that embezzled money did not constitute taxable income. This determination caused the Government, in many cases, to change its tactics to argue that diverted funds to a shareholder were in reality constructive dividends and consequently taxable income. Dizenzo v. Commissioner,348 F.2d 122, 126 (2d Cir. 1965) and cases cited therein. Subsequently the Supreme Court reversed itself and held in James v. United States,366 U.S. 213, 221 (1961), that embezzlement did result in taxable income. *490 Under James petitioner has taxable income if he acquired the proceeds of the two Ferroxcube checks without consensual recognition, either expressed or implied, of an obligation to repay and without restriction with respect to their disposition. A rare exception to this rule has been established "where a taxabpe withdraws funds from a corporation which he expects with reasonable certainty he will be able to repay, where he believes that his withdrawal will be approved by the corporation, and where he makes a prompt assignment of assets sufficient to secure the amount owed." Gilbert v. Commissioner,552 F.2d 478, 481 (2d Cir. 1977), revg. T.C.Memo. 1976-104. Petitioner argues that he had prior approval to withdraw the proceeds and that therefore his withdrawal thereof was a nontaxable loan. Whether petitioner had consent prior to the actual withdrawal is a question of fact. In support of his position petitioner argues that the minutes of the board of directors meeting purportedly held in October 1969 and his own testimony prove that he was authorized to borrow up to $60,000 from Ulster Tool and Die. Once again we simply do not believe petitioner. *491 Falatyn, the other 50 percent shareholder, testified that he discovered that the Ferroxcube checks had been diverted by petitioner only after he confronted petitioner. Both petitioner and Falatyn acknowledge that Falatyn became upset with petitioner during this confrontation. The minutes petitioner relies upon were prepared at Falatyn's request following the February 1970 confrontation, and then only for the purpose of documenting, in some form, petitioner's diversion of the Ferroxcube checks. Petitioner concedes that the minutes were back dated, but argues that they reflect an understanding reached in October 1969 with Falatyn with respect to a future loan to him. However, Falatyn's testimony does not support this claim. Nor was this so-called loan made in the usual manner, when you consider that the distribution was accomplished by diverting corporate receipts. Falatyn's credible testimony on this issue and the unusual manner in which the proceeds were obtained clearly establishes that petitioner lacked the consensual recognition required under James,supra.We find that petitioner did not receive an authorized loan at the time he diverted the Ferroxcube checks. *492 Further we find that throughout 1970 petitioner's receipt of the Ferroxcube proceeds was not intended as a loan. Since any appeal to this decision lies to the Second Circuit we are bound by that court's reversal of our decision in Buff v. Commissioner,496 F.2d 847 (2d Cir. 1974), revg. 58 T.C. 224 (1972). Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. den. 404 U.S. 940 (1971). We had held in Buff that a subsequent same year "consensual agreement between the petitioner and his employer to treat the transaction as giving rise to a 'debt' from the petitioner" (at p. 232) erased the earlier embezzlement income. The Second Circuit reversed us, apparently on the theory that the receipt of income by a cash basis taxpayer is irreversible from a tax point of view. [496 F.2d at 849.] Hence, for purposes of this case it is sufficient to hold that there was no intent by petitioner to borrow funds from his corporation at the time he took the two Ferroxcube checks, and we need not speculate on the existence of any subsequent agreement to repay. Nor *493 need we concern ourselves, in the Second Circuit, with labeling the taking of the checks as a constructive dividend or embezzlement even though the latter label might make it psychologically easier to find fraud. The final issue is whether any of the underpayment of tax in 1970 was due to fraud within the meaning of section 6653(b). Fraud is an actual intentional wrongdoing; the intent required is the specific purpose to evade a tax believed to be owing. McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). In order to prove an underpayment due to fraud, respondent must prove, by clear and convincing evidence, that petitioner had the specific purpose and intent to evade a tax believed to be owing and the underpayment of tax must be due to, or caused by, the purpose and intent to evade tax. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. The existence of fraudulent underpayment can be established by circumstantial evidence and reasonable inferences drawn from the record. Stoltzus v. United States,398 F.2d 1002, 1005 (3d Cir. 1968). *494 However, the mere suspicion of fraud is insufficient and it will not be imputed or presumed. Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959). A finding of fraudulent underpayment of income tax will prevent petitioner from raising the statute of limitations bar with respect to 1970. Section 6501(c)(2). Respondent has limited his argument with respect to fraudulent underpayment to petitioner's omission of the proceeds from the two Ferroxcube checks. We have found that in each year petitioner and Falatyn would carefully review the corporate tax returns. However, neither informed Schatzel, the corporation's tax return preparer, of receipt of the proceeds from the Ferroxcube checks and of their omission from the corporation's income tax returns for the fiscal year ended August 31, 1970. Inclusion of the Ferroxcube checks would have increased the corporation's taxable income from $25,364.92 to $80,831.44 or more than three times the amount reported. The size of the discrepancy makes it unreasonable to believe petitioner was unaware of the omitted income. Furthermore, even after the aforenoted review of the corporate return for the fiscal year ended August 31, 1970, as *495 well as after reviewing the returns for the fiscal years 1971, 1972 and 1973, neither petitioner nor Falatyn informed Schatzel that petitioner had borrowed the proceeds of the Ferroxcube checks and that the loan was omitted form the corporation's tax return. This contrasts sharply with the treatment of other loans to petitioner. For example, on October 6, 1971 petitioner borrowed $25,000 from Ulster Tool and Die. This loan was distributed to petitioner in the form of a check written on the corporate bank account of Ulster Tool and Die. Petitioner repaid the $25,000 loan on July 18, 1972. The loan and repayment were reflected in the books and records and the tax return of Ulster Tool and Die in the years in which the loan and repayment occurred. Between December 24, 1974 and October 30, 1975 petitioner repaid $50,000 of the Ferroxcube loan and the balance at the time he sold his share of the corporation to Falatyn. However, these repayments were made after petitioner was notified by the Internal Revenue Service that he was under criminal investigation for his failure to report the receipt of the Ferroxcube checks. Further, petitioner failed to give an adequate reason for repaying *496 the 1971 reported loan before making any repayment of the 1970 unreported loan. Petitioner argues that, because of the minutes authorizing a loan to him, his treatment of the Ferroxcube proceeds as a loan was reasonable. Therefore, even if the diversion of the proceeds created income, his failure to report it was not due to an intentional attempt to defraud the Government. Petitioner's reliance on the minutes is misplaced.Even taken at face value the minutes only authorized the making of a loan to petitioner, they do not document the actual existence of the loan. More importantly, while the mainutes were prepared after petitioner diverted the proceeds, there is no certainty that they were prepared during 1970. Falatyn testified that the minutes could have been prepared over a year after his confrontation with petitioner. This Court will not assume that Falatyn's knowledge of petitioner's receipt of the proceeds necessarily meant that petitioner had agreed to repay Ulster Tool and Die. To the contrary, the evidence strongly supports a finding that some other agreement may have been reached. The evidence of intentional wrongdoing is substantial. For over 3 years petitioner *497 failed to inform the corporation's accountant of receipt of the Ferroxcube checks, or of the existence of the so-called loans.No documentation of the loans was ever created. The manner in which the Ferroxcube proceeds were diverted to petitioner is contrary to the manner in which other loans, prior to and after the diversion of the Ferroxcube checks, were made to petitioner. These factors, combined with the size of the discrepancy created by omitting the income from the corporate return and petitioner's knowledge of the manner in which the corporation's income was determined, establish by clear and convincing evidence that petitioner never intended to treat the proceeds as a loan and that his failure to report the income was with intent to defraud the Government. Decisions will be entered for the respondent.
Footnotes
1. After concessions the remaining issues involve transactions which only Anthony Pizzarelli was a party. Therefore, he is referred to as petitioner.↩